# REDACTED

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA    )
                            )
v.                          )
                            )        1:03cr189
IYMAN FARIS,                )
                            )
        Defendant.          )

FILED
NOV 28 2006
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

### MEMORANDUM OPINION

Before the Court is defendant Iyman Faris's Motion to Vacate Judgment of Conviction Under § 2255, in which he seeks to have his guilty pleas and sentence set aside due to ineffective assistance of counsel in advising him about his guilty pleas and in litigating his motion to withdraw those pleas. For the reasons set forth below, Faris's Motion to Vacate Judgment of Conviction will be dismissed.

## I. Background and Procedural History

Iyman Faris ("Faris"), a native of Kashmir, moved to the United States in 1994 and was naturalized in 1999. Before being prosecuted, Faris worked as a truck driver based out of Columbus, Ohio, hauling freight nationwide.

The Federal Bureau of Investigation ("FBI") first became aware of Faris through the investigation of a third party.[1] On

---

[1] Based on an ex parte in camera inspection of certain government pleadings, the Court has concluded that no constitutional rights of Faris were infringed by the manner in which his name came to the attention of the FBI.

March 19, 2003, agents approached and briefly questioned Faris in a hotel in Cincinnati, Ohio. Subsequently, the FBI agents interviewed Faris over several days in Columbus, Ohio, and asked him to travel with them to the FBI Academy in Quantico, Virginia. Faris agreed to go to Quantico, where he continued to be interviewed for several more days. In those interviews, Faris told the investigators that before and after September 11, 2001, he had made trips to Pakistan and Afghanistan, where he met with Osama Bin Laden and other members of al Qaeda who were considering terrorist plots in the United States. Faris said he had done research on ultralight airplanes for members of al Qaeda, had provided the results of his research to members of al Qaeda, had run errands with members of al Qaeda that included purchasing sleeping bags for use at al Qaeda training camps and obtaining extensions on plane tickets used by al Qaeda members traveling to Yemen, and that, at the request of members of al Qaeda, he had investigated the possibility of destroying the Brooklyn Bridge by severing the cables with gas wire cutters. As part of his involvement in planning a possible attack in the United States, he admitted to exploring the conceivability of obtaining gas cutters and casing the Brooklyn Bridge to determine if such a method of destruction were viable.

On April 4, 2003, an experienced defense attorney, J. Frederick Sinclair ("Sinclair"), was appointed under the Criminal

2

Justice Act, 18 U.S.C. § 3006A, to represent Faris. Over the next month, while still housed at Quantico, Faris met with Sinclair regarding his options. On April 17, 2003, a pre-indictment plea agreement was executed between Faris, Sinclair, and the United States.

Two weeks later, on May 1, 2003, Faris entered guilty pleas to a two-count criminal information, which charged him with conspiracy to provide material support to a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B and 371 (Count One), and providing material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Count Two). Faris's guilty pleas were entered pursuant to the plea agreement that he had signed on April 17 and included a detailed Statement of Facts outlining the conduct supporting the charges.

The sentencing hearing was originally set for August 1, 2003, however, on July 24, 2003, Sinclair filed a Motion to Determine Defendant's Mental Competency, which was granted by the Court the same day. The sentencing date was re-scheduled to September 28, 2003, to allow for a mental evaluation of Faris. That examination was conducted by Dr. Richard A. Ratner, who concluded that Faris was competent.

On September 24, 2003, Sinclair filed a pleading indicating that Faris wanted to withdraw his guilty pleas. In response, the

3

Court continued the sentencing hearing to allow time for the United States to respond to the issues raised in the motion. On October 28, 2003, Faris's motion to withdraw his guilty pleas was denied and he was subsequently sentenced to a term of 240 months in prison, in addition to other sanctions.

Faris unsuccessfully appealed the denial of his motion to withdraw his guilty pleas and his conviction.[2] See United States v. Faris, 388 F.3d 452 (4th Cir. 2004). However, the Supreme Court granted Faris's petition for writ of certiorari with respect to a sentencing issue that implicated United States v. Booker, 543 U.S. 220 (2005), and remanded the case to the Fourth Circuit on March 21, 2005 for further consideration. Faris filed a Supplemental Brief on June 25, 2005, in which he conceded that under the Fourth Circuit's post-Booker decisions, there was no basis for a new sentencing hearing. His original sentence was thus reaffirmed by the Fourth Circuit on December 29, 2005. See United States v. Faris, 162 Fed. Appx. 199 (4th Cir. 2005).

Faris timely filed the instant collateral attack on his conviction and sentence pursuant to 28 U.S.C. § 2255. The United States has responded and Faris has filed a Reply.

II. Discussion

A.

To be entitled to relief under § 2255, a prisoner must

---

[2] New counsel was appointed to represent Faris on appeal.

demonstrate either a lack of jurisdiction by the convicting court, a constitutional error, or a legal error so grave as to be "a fundamental defect which inherently results in a complete miscarriage of justice." United States v. Addonizio, 442 U.S. 178, 185 (1979). It is only these "fundamental" or constitutional errors that a court may consider on collateral review.

Faris argues that Sinclair was constitutionally ineffective in his representation with respect to his advice about pleading guilty and his subsequent litigation of Faris's motion to withdraw his guilty pleas. To succeed on a claim of ineffective assistance of counsel, a movant must satisfy the two-part test established in Strickland v. Washington, 466 U.S. 668 (1984). First, he must show that "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." Id. at 690 (defining ineffective assistance of counsel as conduct falling below an objective standard of reasonableness and applying a strong presumption of competence and deference to an attorney's judgment). Second, the movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Thus, under Strickland, "the petitioner must show both deficient performance and prejudice; the two are separate

and distinct elements of an ineffective assistance claim."
Spencer v. Murray, 18 F.3d 229, 232-33 (4th Cir. 1994).

With respect to the performance prong, "[j]udicial scrutiny
of counsel's performance must be highly deferential," Strickland,
466 U.S. at 689, and the court must "presume that challenged acts
are likely the result of sound trial strategy." Spencer, 18 F.3d
at 233. Moreover, "the analysis of the counsel's performance
typically must be comprehensive; i.e., not narrowly limited to a
review of counsel's failings." Strickland, 466 U.S. at 689.

With respect to the prejudice prong, "a reasonable
probability is a probability sufficient to undermine confidence
in the outcome." Strickland, 466 U.S. at 694. In the context of
a guilty plea, the second prong is modified to require the movant
to show that "there is a reasonable probability that, but for
counsel's errors, he would not have pleaded guilty and would have
insisted on going to trial." See Hill v. Lockhart, 474 U.S. 52,
59 (1985); Burket v. Angelone, 208 F.3d 172, 194 (4th Cir. 2000);
see also Fields v. Attorney Gen. of Maryland, 956 F.2d 1290,
1296-7 (4th Cir. 1992). It is the movant's burden to prove
Strickland prejudice. Fields, 956 F.2d at 1297 (citation
omitted). If the movant cannot demonstrate the requisite
prejudice, a reviewing court need not consider the performance
prong. Id. Therefore, the central inquiry is whether, but for his
counsel's alleged errors, a reasonable defendant would not have

6

pled guilty and would have insisted on going to trial. <u>Hill</u>, 474 U.S. at 59.[3] Faris's claims fail to meet either of the prongs of the <u>Strickland/Hill</u> test.

B.

Faris alleges that Sinclair was ineffective because he did not adequately investigate the facts and circumstances of the case before advising him to enter a plea agreement. Specifically, he argues that before negotiating the plea agreement, Sinclair should have read the FBI 302 Report of Faris's interviews with the FBI,[4] insisted on obtaining documents from the government through the discovery process, and sought disclosure of any electronic surveillance of Faris. He further contends that Sinclair should have more thoroughly investigated the law with regard to the government's power to designate Faris an enemy combatant and possibly transport him to Guantanamo Bay. Finally, Faris contends that Sinclair put undue pressure on him to plead guilty because he was more interested in furthering the government's investigation than in helping Faris.

---

[3] Faris repeatedly contends that at the least, he would have been able to negotiate a more favorable plea bargain but for Sinclair's ineffectiveness. The Fourth Circuit has clearly rejected such claims as a basis for establishing prejudice, as have other circuits. <u>Fields</u>, 956 F.2d at 1297; <u>see also</u> <u>Craker v. McCotter</u>, 805 F.2d 538, 542 (5th Cir. 1986).

[4] The FBI 302 Report summarizes the interrogation session notes made during interviews of Faris from March 20, 2003 to May 1, 2003.

7

i. The FBI 302 Report.

Faris argues that Sinclair should have read the FBI 302
Report because it would have revealed inconsistencies in the
statements Faris had given to the interviewing agents and
prompted Sinclair to conduct further investigation into Faris's
culpability. The 302 Report was not available, however, while
Sinclair was working with Faris on the plea agreement, and there
is no merit to Faris's argument that Sinclair should have delayed
the plea bargaining process for months until he reviewed the FBI
302 Report.[5] Moreover, Sinclair's understanding of the facts was
based on what Faris himself told Sinclair, and thus Faris was in
the best position to alert Sinclair to any inconsistencies in the
statements he had given the FBI before he plead guilty.[6] However,
as the plea colloquy demonstrates, Faris, while under oath,

_____

[5] The investigators did not reduce the interviews to a
written report until August 2003, which was three months after
Faris pled guilty on May 1, 2003. In his § 2255 Motion, Faris
concedes that the 302 Report was not prepared until August.
Counsel noted, "Although the Report states that it was dictated
and transcribed on 3/21/03, that is apparently in error because
the Report was not available to be turned over to Mr. Sinclair
until late August 2003." Defendant's Memorandum of Law, 10 fn9.

[6] Although Faris highlights inconsistencies between the
Statement of Facts and the 302 Report in his affidavit supporting
this Motion, Faris does not—and has never—alleged that the
information contained in either document was falsified by the
interviewing agents, nor does he explain why or how he
purportedly fabricated the details he reported. Furthermore, he
does not deny that he traveled to Pakistan and Afghanistan, that
he met Osama bin Laden and other members of al Qaeda, or that he
visited an al Qaeda training camp.

8

acknowledged what he had told investigators and agreed with the Statement of Facts included with the plea agreement.

On direct appeal the Fourth Circuit specifically affirmed the district court's finding that the overall consistency between the FBI 302 Report and the Statement of Facts, along with Faris's sworn statements during the plea hearing, undermined his assertions that the inconsistencies revealed by the 302 Report demonstrated actual innocence. Thus, on this record, Faris cannot demonstrate that even if Sinclair had reviewed the FBI 302 Report before Faris plead guilty, that review would have led to a different strategy. Because Faris has not satisfied either the performance or prejudice prongs of the Strickland/Hill test, this allegation fails.

ii. Discovery of documents.

Faris complains that Sinclair failed to seek discovery from the government before negotiating the pleas. The record is clear that immediately after being appointed to represent Faris, Sinclair met with the case agents to determine what evidence they had against Faris and whether that evidence had been corroborated.[7] Both Sinclair and Special Agent Jack Vanderstoep ("Vanderstoep") aver that Sinclair extensively interviewed the

---

[7] Notably, Faris had voluntarily submitted to numerous interviews with FBI investigators for more than two weeks before Sinclair was appointed.

case agents.[8] Sinclair avers that after meeting with the agents, he met with Faris, who confirmed that he had cooperated with investigators and made substantive admissions about his involvement with al Qaeda. Sinclair told Faris to stop the interviews with the case agents until a plea agreement could be reached. Sinclair met with his client at least four times between his appointment on April 4 and Faris's guilty pleas on May 1, 2003.

Sinclair also states in his affidavit that he concluded that any information Faris had regarding current terrorist plots in the United States would be highly valued by the government and would most likely merit a Rule 35 motion for reduction of sentence. On this record, it was not an unreasonable tactical decision for Sinclair to emphasize to his client that he continue timely cooperation with the government rather than delay the proceeding by requesting extensive discovery from the prosecutor. The Supreme Court has advised, "in any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. 690-91. In light of the circumstances facing Sinclair's client, including the post-September 11 environment in which his

---

[8] Faris has not filed a counter-affidavit to dispute the assertions of Sinclair or Vanderstoep.

10

client was being investigated and the threat of having Faris declared an enemy combatant if he did not cooperate, Sinclair's decision not to investigate further was reasonable.

Moreover, Faris has not suggested what useful information Sinclair might have found through further discovery, and therefore has not established that he was in any way prejudiced by Sinclair's decision. Lastly, he offers no evidence that he would not have plead guilty and would have insisted on going to trial if Sinclair had conducted further discovery. Accordingly, this claim has no merit.

iii. Electronic surveillance.

Finally, Faris argues that Sinclair should have sought discovery as to any electronic surveillance of his client. Faris bases this argument on the recent revelations of secret electronic surveillance conducted by the National Security Administration ("NSA") outside the normal process established in the Foreign Intelligence Surveillance Act ("FISA"), and executive branch officials' statements in the media that such NSA electronic surveillance had been used in Faris's case.[9] Faris contends that any allegedly illegal electronic surveillance should have been discovered by Sinclair during his investigation of the case, and implies that had Sinclair sought disclosure of

---

[9] Media reports relied upon by Faris ████████████████████
████████████████████████████████████████████ See
supra note 1.

11

electronic surveillance during discovery, he might have
discovered the NSA's activities. Faris's argument as to the
electronic surveillance is purely speculative and lacks merit for
several reasons.

The case against Faris rested on statements that Faris had
made to investigators, not on statements Faris had made to third
parties that might have been intercepted. Although Faris later
alleged that his statements to investigators were false, he has
never alleged that the information on which his guilt was
determined was discovered in any way other than from his own
interviews with FBI investigators.

Moreover, as media coverage of the NSA surveillance program
has revealed and the prosecutors have admitted, the program was
absolutely secret in 2003. Even if Sinclair had requested
disclosure of any electronic surveillance, there is no way he
would have learned of the NSA program because not even the
prosecutors were aware of it.

Finally, to the extent that the government may have
initially been made aware of Faris through electronic
surveillance, the government has repeatedly contended—and Faris
has not disputed—that Faris came to their attention during
surveillance conducted in connection with a separate
investigation. Faris does not have standing to challenge even
unlawful electronic surveillance of a third party. See Alderman

v. U.S., 394 U.S. 165, 172 (1969); U.S. v. Apple, 915 F.2d 899, 905 (4th Cir. 1990); U.S. v. Cobb, 432 F.2d 716, 719-720 (4th Cir. 1970).

As this Court has confirmed, no inculpatory information ████ ████████████████████████████████████████████████ Thus, Faris cannot show prejudice from Sinclair's failure to try to obtain this information.

iv. Enemy Combatant Status.

Faris alleges that Sinclair should have investigated the law more fully with regard to the possibility that Faris could be designated an enemy combatant and transferred to Guantanamo Bay, Cuba, due to his admitted involvement with al Qaeda. He maintains that this possibility more than any other caused him to plead guilty and that if Sinclair had investigated this possibility further, he would have concluded that the United States did not have the power to make such a designation with regard to Faris, a naturalized U.S. citizen.

Sinclair and Faris agree that, in evaluating Faris's options, Sinclair told Faris he faced this possibility. Both Sinclair and Faris state that Sinclair was uncertain at the time of the power of the government to make such a designation. However, the case of Padilla v. Rumsfeld makes it abundantly clear that during the spring of 2003 when Faris was considering whether to plead guilty, the government had indeed declared a

U.S. citizen an enemy combatant, and that it was not until several months after Faris entered his guilty pleas that a court found such action unconstitutional. 352 F.3d 695 (2d Cir. 2003), vacated on jurisdictional grounds, 542 U.S. 426 (2004). Therefore, further inquiry by Sinclair at that time would only have confirmed the possibility that he communicated to Faris. Faris cannot show prejudice resulting from Sinclair's failure to make further investigation into this issue.

v. Pressure.

Faris implies, but does not specifically argue, that Sinclair put pressure on him to plead guilty. Sinclair denies that he pressured his client into pleading guilty, and the record supports Sinclair's assertion. In fact, the record demonstrates that Sinclair worked closely with Faris to negotiate his plea agreement with the government, and that Faris himself actively participated in the plea bargaining process.

Initially upon meeting with Faris, Sinclair advised him to discontinue his interviews with the investigators until he could negotiate some kind of immunity for Faris. Both Sinclair and Vanderstoep aver that by the time Sinclair met with Faris, Faris had already met with prosecutors at his own request, who had informed him that any "deal" made between them would have to include a guilty plea to felony charges and jail time.

Faris does not dispute that he instructed Sinclair to

14

negotiate a plea. Originally, the government's offer required
Faris to plead guilty to two counts of providing material support
to al Qaeda, in violation of 18 U.S.C. § 2339B, which would carry
a potential thirty-year sentence. Sinclair states in his
affidavit that after investigating whether the government had
evidence to support the proposed charges under § 2339B he advised
Faris not to take this plea offer. Faris, in turn, told Sinclair
that he would consider a plea agreement limiting his exposure to
a single count of violating § 2339B. Sinclair relayed this
information to the government.

   The prosecutors responded with a second offer: Faris would
plead guilty to a count of conspiracy under 18 U.S.C. § 371 and a
substantive violation under § 2339B. These two charges would
expose him to twenty rather than thirty years of imprisonment.
The plea agreement also included a broad grant of immunity from
prosecution in other jurisdictions for the offenses and for any
further truthful information Faris provided. Finally, it included
the government's option to file a Rule 35 motion for reduction of
sentence if Faris's cooperation were of sufficient value. After
reviewing the agreement with Sinclair and keeping a copy
overnight, Faris signed the plea agreement on April 17, 2003.
Faris resumed his interviews with the FBI investigators after he
signed the agreement.

   Faris had two more weeks to consider whether to plead

guilty. On May 1, 2003, Sinclair met with Faris again, and reviewed the plea agreement line by line to make sure that Faris understood it in preparation for his plea colloquy with the Court. That afternoon, the Court conducted an extensive plea colloquy in which Faris was advised that he still had the option to withdraw his guilty pleas, even though he had already signed the plea agreement. Faris was fully advised about the rights he was waiving with a pre-indictment plea and about the types of defenses related to the legality of searches and the admissibility of statements that he was abandoning by pleading guilty. Faris acknowledged that he understood that he was waiving these defenses. He also affirmed that Sinclair had answered all his questions about the plea agreement, that he had told Sinclair everything he knew about the case, and that he was "fully satisfied" with Sinclair's representation. He was specifically asked if anyone had put any force or pressure on him to plead guilty, and he answered, "No."

Finally, the Court reviewed each paragraph of the Statement of Facts, pausing after each allegation of fact to ask Faris if it were true. At one point during this process, Faris corrected the chronology of events; otherwise, Faris agreed that every allegation was correct. Based on the plea colloquy, the Court found that Faris had entered the plea agreement and plead guilty in a knowing, intelligent, and voluntary manner.

The Supreme Court has held that "representations of the defendant, his lawyer, and the prosecutor at [a plea] hearing, as well as findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceeding." Blackledge v. Allison, 431 U.S. 63, 74-75 (1977). Further, statements previously made under oath affirming satisfaction with counsel (e.g., in a Rule 11 plea colloquy) are binding on a defendant absent "clear and convincing evidence to the contrary." See Fields, 956 F.2d at 1299 (citing Blackledge, 431 U.S. at 74-75).

Faris has not met the heavy burden of refuting his sworn statements. The record reflects a thorough and exacting plea colloquy and demonstrates that Faris had opportunities during the two weeks between signing the plea agreement and appearing for his plea colloquy and during the colloquy itself to express any dissatisfaction with his counsel.

Further, Faris participated actively in the strategic negotiation of his pleas. He worked with his attorney to negotiate a plea agreement, rejecting one, making a counteroffer, and agreeing to an offer that represented a compromise between the government's initial position and his counteroffer. He obtained provisions that were favorable to him, including a reduction of exposure from thirty to twenty years in prison, a broad immunity grant, and the possibility for a further sentence

reduction.[10] On this record, there is no evidence of
involuntariness and Faris's contention that he was pressured into
pleading guilty is unfounded.

C.

Faris also alleges that Sinclair was constitutionally
ineffective in his litigation of Faris's effort to withdraw his
guilty pleas. Although a defendant may withdraw a guilty plea
before sentencing upon showing "a fair and just reason," Fed. R.
Crim. P. 11(d)(2)(B), the Fourth Circuit has outlined six factors
("the Moore factors") that the district court must use to
determine whether to permit a defendant to withdraw a guilty
plea. United State v. Moore, 931 F.2d 245, 248 (4th Cir. 1991).[11]
Faris alleges that Sinclair was ineffective in litigating the
withdrawal motion by focusing his oral argument on just one of
the Moore factors, rather than addressing all six.

When Faris first indicated a desire to withdraw his pleas,

---

[10] Faris has not rebutted the claim in Sinclair's and
Vanderstoep's affidavits that Faris first became dissatisfied
with his plea agreement only after he was told in post-plea
debriefings that an 80% reduction to his sentence was unlikely.

[11] The six factors are: (1) whether the defendant has offered
credible evidence that his plea was not knowing or voluntary, (2)
whether the defendant has credibly asserted his legal innocence,
(3) whether there has been a delay between the entering of the
plea and the filing of the motion, (4) whether the defendant has
had close assistance of competent counsel, (5) whether withdrawal
will cause prejudice to the government, and (6) whether it will
inconvenience the court and waste judicial resources. Moore, 931
F.2d at 248.

Sinclair pursued another strategy that ultimately failed: he
ordered a mental examination of Faris to determine his
competence. The report of the forensic psychiatrist, filed the
morning of the hearing, concluded that Faris was competent.

Sinclair avers that Faris offered no reason for his decision
to withdraw his pleas other than his assertion that the
information he had given the FBI investigators during his
interviews was false, in spite of his sworn statements to the
contrary. He made no assertion that his pleas had not been
voluntary or that he had been improperly pressured to enter the
plea agreement.[12] Based on what his client told him, Sinclair
focused his argument on a claim of actual legal innocence under
the second Moore factor, centering on discrepancies between the
Statement of Facts accompanying the plea agreement and the FBI
302 Report of Faris's interviews, which had only recently been
made available to him.

This strategy was well within Sinclair's exercise of
judgment given the circumstances. The reasonableness of counsel's
actions often depends on "informed strategic choices made by the
defendant and on information supplied by the defendant."
Strickland, 466 U.S. at 691. In this case, Faris decided suddenly
that he wanted to withdraw his pleas after a tense interview with
FBI investigators in which Faris demanded an 80% reduction in his

---

[12] Faris does not dispute Sinclair's assertions.

19

sentence from the government, a demand that was met with a
reminder that any reduction in sentence was within the
prosecutor's discretion to request. Thereafter, Faris offered no
reason to Sinclair as to why he wanted to withdraw his pleas
except for his alleged false statements to the investigators.
Given the lack of information supplied by his client, Sinclair's
strategic decision as to how to litigate the withdrawal of the
guilty pleas was reasonable. Faris has not demonstrated that
Sinclair's performance in this regard fell below an objective
standard of reasonableness.

        Even if he could show that Sinclair's performance on this
issue was defective, Faris cannot show prejudice from this error.
Although Sinclair focused on one of the Moore factors during his
oral argument, the district court reviewed all six factors in
reaching its decision, and concluded that Faris had not satisfied
any of them. The Fourth Circuit also analyzed each Moore factor
in examining Faris's case on appeal, and although it disagreed
with the district court as to the application of two of the
factors, it affirmed the district court's final decision that the
factors did not weigh in favor of allowing Faris to withdraw his
pleas.[13] Thus, Faris cannot demonstrate prejudice from the manner

_____

[13] The Fourth Circuit found that the fifth factor, prejudice
to the government, should be deemed neutral rather than weighing
against Faris. It also found that the sixth factor, inconvenience
and waste of resources, was analyzed erroneously in part,
although it did not disagree with the district court's conclusion

20

in which Sinclair moved for withdrawal of Faris's guilty pleas.

### III. Conclusion

As the discussion above establishes, none of Faris's arguments have merit. Accordingly, his Motion to Vacate Judgment of Conviction will be dismissed by an appropriate Order to be issued with this Memorandum Opinion.[14]

Entered this __7th__ day of November, 2006.

___/s/_____

Leonie M. Brinkema
United States District Judge

Alexandria, Virginia

---

that this factor weighed against Faris. In sum, the Fourth Circuit agreed with the district court's analysis as to four of the factors and its final conclusion.

[14] Faris also requested an evidentiary hearing. Because the Court has found that none of Faris's arguments have merit, an evidentiary hearing is not needed. By Order dated October 26, 2006, this Court denied Faris's Motion for Discovery Under Rule 6(a).